Easton *v.* H. Boker & Company.

5-1021 · 292 S. W. 2d 257

Opinion delivered July 2, 1956.

*John E. Harris* and *Clinton R. Barry,* for appellant.

*Shaw, Jones & Shaw,* for appellee.

Ed. F. McFaddin, Associate Justice. This is a workmen's compensation case. The appellee, H. Boker & Company, operates a scissors manufacturing plant in Fort Smith, and appellant-claimant, Easton, has worked in that factory for more than twenty-five years.

On June 2, 1953, while changing a grinding wheel, Mr. Easton hurt his left elbow. He was treated for the injury, and Xrays disclosed a fracture of a small outside portion of one of the bones around the left elbow. Mr. Easton suffered great pain in the left arm and was thereby incapacitated from work. Even though he was left-handed, his work required the full use of both hands. Numerous doctors examined him and all agreed that his injury was disabling. He drew temporary partial disability compensation until January 15, 1954, when his compensation payments were stopped. Thereupon, he filed this claim for continuation of his compensation; a single Commissioner decided adversely to Mr. Easton; the full Commission reviewed the record and heard other evidence and decided against Mr. Easton; the Circuit Court affirmed the Commission; and the case is here on appeal.

The sole question on this appeal is whether there is any substantial evidence to support the factual finding of the Commission, which was that Mr. Easton's temporary partial disability ceased on January 15, 1954. Our cases hold that factual findings of the Commission, if supported by substantial evidence, have the force and effect of a jury verdict. See *Chicago Mill & Lbr. Co. v. Fulcher,* 221 Ark. 903, 256 S. W. 2d 723; and cases there cited. With the foregoing understood, we come to the evidence in the case at bar. It is admitted by all parties that Mr. Easton was disabled by the injury he received on June 2, 1953, and that he remained disabled until January 15, 1954. Mr. Easton claims that he is still disabled. The appellees claim that he was restored to full ability to work on January 15, 1954; and that is the issue in this case.

The evidence reflects that on December 18, 1953, Mr. Easton, at the request of the appellee and its insurance carrier, allowed himself to be subjected to an operation on his left arm for the ostensible purpose of removing the fractured bone fragment on the outside of his elbow. The doctor who performed the operation said it was a success; but no one has ever denied that Mr. Easton is still undergoing as much pain in his left arm as he suffered before the operation. The only evidence offered by appellee and its insurance carrier, seeking to show Mr. Easton's condition *after the operation,* is contained in *four reports* made by two doctors to the insurance company. We now summarize and discuss these reports:

(a) On December 28, 1953, the doctor who performed the operation wrote the insurance company that he thought that Mr. Easton would have "one additional week of total temporary disability." So this report shows that Mr. Easton was not restored to full ability to work at that time.

(b) On January 6, 1954, the same doctor wrote the insurance company that Mr. Easton "should be considered disabled until his immediate post-operative course

has been completed. I anticipate this will be within the next two weeks." So this report shows that Mr. Easton was not then restored to full ability to work.

(c) On February 10, 1954, the same doctor wrote the insurance company regarding Mr. Easton:

"It is my feeling that he has reached maximum benefit from treatment and may be discharged from active treatment at this time. I do not feel that he has any measurable permanent[1] disability. The paresthesias[2] of which he complains are those which, in my experience, are relative to any post-operative condition about the elbow, and all of which disappear with time."

The report of February 10, 1954 does not say that Mr. Easton was *then* able to do his full work: rather the doctor said that Mr. Easton was still experiencing pain, which the doctor thought would "disappear with time." Just why Mr. Easton was cut off of disability benefits on January 15, 1954, in the face of this letter of February 10, 1954, is a matter beyond our understanding. Certainly Mr. Easton was not capable of doing full work on February 10, 1954.

(d) On March 24, 1954 another doctor made a report to appellee's insurance carrier as to Mr. Easton's condition at that time. In that report (two single-spaced typewritten pages) the doctor not only reviewed the entire history of Mr. Easton's disability, but told of Mr. Easton's then condition and also gave the doctor's opinion as to Mr. Easton's future condition. We copy these excerpts:

"There is hypalgesia[3] involving the entire left hand in a glove distribution extending up to the distal crease of the forearm on the palmar aspect of the forearm and extending up to the scar on the dorsal radial aspect of the forearm and swinging down gradually to meet the

---

[1] Notice that the doctor made reference to *permanent* disability rather than *temporary* disability.

[2] Webster defines this as meaning "a sensation as a prickling, tingling, or creeping, on the skin, without objective cause."

[3] Maloy's Medical Dictionary for Lawyers defines hypalgesia as "a condition in which the patient has a diminished sensitiveness to pain."

area on the front of the forearm on the dorsal ulnar aspect of the forearm. He consistently finds the pin point a little sharper over the little finger than he does over the other fingers of his hand but detects no difference in the sensation to pin prick on the ulnar and radial sides of the 4th finger nor over the ulnar and radial sides of the middle finger (in other words, he seems to have the same impairment in the portion supplied by the ulnar nerve as he has in the portion supplied by the median nerve). He has some mild disturbance of sensation up to the region of the insertion of the deltoid in the mid portion of the arm . . . The sensory disturbance of the hand does not follow a known anatomical distribution. It is entirely possible that the more definite sensory loss on the dorsal radial aspect of the forearm may be due to an injury to a cutaneous nerve but I feel that is of no particular significance as far as function is concerned.''

Now with those findings, the doctor making the report gave the following as his opinion:

''I feel that this patient is definitely able to work and that his healing period should be terminated. It is entirely possible that going back to a job that requires constant use of the left hand after this long period of idleness may cause some difficulty *and it probably would be much better if he could be put at a job that was less exacting for the left hand for a week or two and then work back into his old job rather than suddenly putting him into this activity.''* (Emphasis our own.)

The foregoing report was on March 24, 1954, and it is crystal-clear that the examining doctor found that Mr. Easton was *then* still suffering pain and that if he went back to work he would have *some difficulty* and that he should be put on a job *less exacting.* This report shows that Mr. Easton was not able to return to *full work* on March 24, 1954. Just how the appellee and its insurance carrier can justify cutting off Mr. Easton's disability payments on January 15, 1954, in the face of this report, is something that we are unable to understand.

As aforesaid, the only evidence[4] in the record in this case even tending to show that Mr. Easton has ever recovered from his temporary partial disability is contained in the four reports from which we have copied above. In none of these reports did any doctor say that, *at the time of such report,* Mr. Easton was able to do a full day's work; nor did any doctor ever say that Mr. Easton was *free of the same pain that he had experienced from the time of his original injury on June 2, 1953.* These reports do not constitute *substantial evidence*[5] in the light of the record here before us, because the opinion of the doctor as to Mr. Easton's possible recovery *in the future* is based on a *state of facts* which definitely showed that Mr. Easton had not recovered at the time of the examination on which the opinion was based. In the case of *U. S.* v. *Thornburgh,* 111 Fed. 2d 278, Judge Sanborn, speaking for the Eighth Circuit Court of appeals, used this language, which we find apropos here:

"A reviewing court, however, is not always required to accept as substantial evidence the opinion of experts. 'Where it clearly appears that an expert's opinion is opposed to physical facts or to common knowledge or to the dictates of common sense or is pure speculation, such an opinion will not be regarded as substantial evidence.' *Svenson* v. *Mutual Life Ins. Co. of N. Y.,* 8 Cir., 87 F. 2d 441, 445. See also *U. S.* v. *Hill,* 8 Cir., 62 F. 2d 1022, 1025; *U. S.* v. *Doublehead,* 10 Cir., 70 F. 2d 91, 92."

Not only is there no substantial evidence to support the Commission's findings against Mr. Easton; rather the evidence is overwhelming to the effect that Mr. Easton has been temporarily partially disabled ever since his original injury in June, 1953. As late as January 15,

[4] Some time after January 15, 1954, the scissors factory was shut down for a short time; and Mr. Easton, along with others, applied for unemployment benefits. In the oral argument before this Court, appellees' counsel, with becoming candor, conceded that such application for unemployment benefit was not substantial evidence that Mr. Easton could work at such time.

[5] In *Arkansas State Highway Comm.* v. *Byars,* 221 Ark. 845, 256 S. W. 2d 738, we discussed in some detail the matter of what is substantial evidence.

1955, before the full Commission, Mr. Easton brought witnesses and offered a doctor's report to show that Mr. Easton was still disabled; that he had gone back to work for the company and tried to do the work; that the company found that he could not do full work; that every time he tried to use his left arm, it swelled up and he was subjected to great and excruciating pain.

The judgment of the Circuit Court is reversed and the cause is remanded to the Circuit Court, with directions to remand the case to the Commission with directions to make an award to Mr. Easton for temporary partial disability benefits and other compensation benefits from January 15, 1954 until the Commission may subsequently decide on a record then made that Mr. Easton is then completely recovered.