ALLIED TELEPHONE CO. ET AL v. LEO RHODES

5-5144                                           454 S. W. 2d 93

Opinion delivered May 11, 1970
[Rehearing denied June 15, 1970.]

*House, Holmes & Jewell,* for appellants.

*Bruce Bennett,* and *Jack Lessenberry,* for appellee.

CARLETON HARRIS, Chief Justice. This is a Workmen's Compensation case. Leo Rhodes, appellee herein, was

admittedly an employee of Allied Telephone Co., one of the appellants herein, on May 9, 1966. Rhodes filed a claim asserting that on May 9 of the aforementioned year, he suffered an injury to his fourth and fifth lumbar vertebrae while helping to move heavy equipment through a door at the Greenbrier office of appellant company. Though the evidence is somewhat confusing, it appears that he did not go to the office for several days, but was carried on the payroll full-time. On May 23, Rhodes consulted Dr. D. W. Langford, a chiropractor of Conway. Langford took X-rays and his diagnosis was that Rhodes had suffered a subluxation of the fourth and fifth lumbar vertebrae. Five visits were made from May 23 through May 30. Langford said he advised that heat and hot baths would be helpful in relaxing the muscles of the spine. The doctor said that adjustments given were beneficial to Rhodes and his report reflected that he pronounced Rhodes able to resume work as of May 27. The doctor's bill in the amount of $40.00 was paid by appellants, and Langford was advised that the carrier would not be responsible for further treatment. Rhodes returned to duty and the payroll records of the company reflect that he worked at regular duties, including some overtime hours, until July 26, 1966, when Rhodes was involved in a one car accident between 1 and 2 A.M., as he was returning from Conway to his home in Greenbrier. On July 29, appellee was discharged because of unauthorized use of a company vehicle. No claim was made for any alleged injury in the car accident, appellee's claim being based entirely on the May 9 incident. Rhodes has not worked since that time, and the record reflects that thereafter he has been observed or treated by numerous doctors including Dr. Dunaway of Conway, Dr. Carruthers of Little Rock, who X-rayed him at St. Vincent's Hospital, Dr. James R. Morrison, radiologist, a number of doctors at the Veterans Hospital, and Dr. Hundley of Little Rock, who filled out the application for social security benefits.[1] Dr. Robert Watson, neuro-

[1] Rhodes, on March 31, 1967, was awarded $128.40 a month in social security benefits for total disability, and it also appears that on November 7, 1966, he had obtained an award of $84.00 a month from the Veterans Administration for a non-service connected disability.

surgeon of Little Rock, operated on Rhodes on two occasions. Though all of these doctors were mentioned by appellee, the record contains only the testimony and reports of Drs. Langford, Morrison, and Watson. The claim was first heard by a referee, who filed an opinion on May 16, 1968, finding that on May 9, 1966, claimant suffered a compensable back injury; that claimant lost no compensable time; further, that Rhodes was involved in an auto accident in a company vehicle but suffered no personal injury; that the claimant was in the course of his employment at the time of that accident.[2] The referee found that claimant's back condition was not caused by the injuries of May 9, 1966, or July 26, 1966, nor was his condition aggravated by either accident. The claim was accordingly denied and dismissed. On appeal, the full commission affirmed the referee except that they disagreed that the accidental injury of July 26 arose out of and in the course of claimant's employment. Rhodes then appealed to the Circuit Court of Faulkner County, and on June 12, 1969, that court found that the opinion and finding of the commission was "not based upon substantial evidence nor a preponderance of the evidence", and held that Rhodes was "permanently and totally disabled and there is no testimony to the contrary". The order of the commission was reversed and that tribunal was directed to enter an award in accordance with the opinion of the Faulkner County Circuit Court. From the judgment so entered, appellants bring this appeal.

At the outset, let it be remembered that in making our determination, we are only concerned with whether there was substantial evidence to support the findings of the commission. *Stout Construction Co.* v. *Wells*, 214 Ark. 741, 217 S. W. 2d 841.

---

[2]It is not at all clear why this finding was made since no claim was filed for compensation. The commission mentioned that no claim was actually made for the incident on July 26, and pointed out that the record of the hearing before the referee reflected that claimant's attorney objected to certain questions relating to the car accident and stated that the claim was for the accident that occurred on May 9, 1966.

Before discussing the medical testimony, we might mention that Roy Montgomery, a repair man for Allied Telephone Co., testified that he was present when Rhodes stated that he had strained his back while lifting something. Montgomery said Rhodes was off work three or four days, but that he remembered that Rhodes did work during May, June, and July. The witness testified that during the months of June and July, he would see Rhodes nearly every day, the latter being a supervisor who would direct Montgomery and some of his fellow employees where to go and what to do. Montgomery did not note Rhodes complaining about his back after the first few days, and he also said that he had heard complaints by appellee relative to his back prior to the date of the accident.

We have already mentioned the testimony of the chiropractor, Dr. Langford. The deposition of Dr. James R. Morrison, associated with St. Vincent's Hospital in Little Rock, was offered by appellee. Morrison interpreted X-ray films which were made on January 20, 1967, and also read films from Conway Memorial Hospital dated August 3, which had been taken at the direction of Dr. Dunaway. Dr. Morrison said:

"The routine films here on January 20, 1967, showed what appeared to be a minimal loss in height of the 4th lumbar vertebral body, which would appear to be a very definite compression fracture of this area. This was the only area of injury on the initial films. There was a previous myelogram at that time. We did have special bending films of his back on January 20, '67, with the patient's back flexed and extended, and these showed some limitation of motion throughout his lumbar area. * * * *

"Ordinarily it takes an injury of some significance to produce this, but certainly in older people we do see compression simply from bending over, and stepping off curbs, and this sort of thing."

Morrison said that he had had occasion to read his

colleague's (Dr. Campbell) diagnosis of the film made at Conway and that the witness and Campbell reached the same conclusions.

On cross-examination, the witness said that he had never examined Rhodes, and that he was not attempting to say that there was any causal connection between appellee's condition and anything that might have happened in the past. When asked what he meant by the term "compression fracture", the doctor replied:

"I mean that the vertebral body in question, the 4th lumbar, has definitely lost its height. There's a very definite loss in the height of this body, which means it has been compressed to lose this height. Now, we use the term compression fracture and compression injury rather loosely in this business, but I think we're talking about the same thing."

Upon further interrogation, Dr. Morrison said that it was entirely possible for a compression fracture to be caused by diseased bone.

Appellants offered the deposition of Dr. Robert Watson of Little Rock, who stated that Rhodes had been sent to him by Dr. Dunaway at Conway. He said that Rhodes gave him a history of lifting some heavy equipment about six weeks prior thereto; that Rhodes did not think he was hurt at the time, but after a few days was treated by Dr. Langford. Appellee had related that he had been back at work for about three weeks when he had the automobile accident, this last causing him to go to Dr. Dunaway, who subsequently sent him to the witness. In his report, Watson said that Dunaway had sent Rhodes to him because he thought claimant had a fractured lumbar vertebra, but Watson stated that he had found no evidence to sustain such a finding. The doctor said there was something wrong with the vertebra "but it isn't a fracture". Rather, "it's an absorption or destruction or a shrinking up of the vertebra". Dr. Watson stated that the lifting incident was not a precipitating factor, "it was a coincidental factor". Further,

"I do not think that the condition aggravated or added pathology. I do think that lifting condition brought to his attention, or brought into the picture, the fact that he had some existing abnormality in the back". When asked if he found any evidence of a' compression fracture of L-4, Watson replied:

"A compression fracture would be a presumptive diagnosis when one first looked at an x-ray and saw that the body was mashed down in shape in contrast to the other vertebra. So a compression fracture is an acceptable presumptive opinion but I had the advantage of opening up this man's back and seeing the bone and seeing the content of the bone and this is diseased bone rather than fractured bone and this disease was granular in that I could take a spoon, so to speak, and scoop the content of this bone, in contrast to its normal bony hardness."

The doctor added that he found no evidence of a crack or a healing crack in appellee's vertebra at L-4, and he said the content of the bone was not what one would observe in a fracture situation. "This was an over-all involvement of the whole vertebra, a destructive change."

Further, from the testimony:

"A myelogram was done and this myelogram showed that there was something, and that 'something' just showed shape, and something was pushing on the nerve at that level, so I operated upon the man and did a laminectomy and that is a procedure in which one separates the muscle away from one side of the back and cuts down into the bony covering of the spine, enough so, as to permit one to get into what we might refer to as the marrow of the spine. With this man I found an unusual appearance, enough to prompt me to send this tissue to the laboratory because I suspected a malignancy.[3]. This was not a run of the mill ruptured

---

[3]Pathology reports revealed small single glands of an abnormal character, but evidences of cancer were not found.

disk situation. Then, despite time and treatment, the man was continuing to be worsened. Nobody is infallible, I thought maybe we'd missed something. For that reason I repeated the man's myelogram and found the condition to be even all the more progressed. And that prompted the second operation."

When asked about Langford's X-ray, Watson replied, "I did not find any subluxation. I found a diseased vertebra." When interrogated about Morrison and his report, the doctor stated:

"Yes, sir, he's fully qualified, but unfortunately he is using the word 'compression' which is fine, this is compressed, we all agree it's compressed, but he is adding the word 'fracture' for which there is no substantiation. It's a hasty assumption simply because it's mashed down does not mean that it's fractured."

We have set out quite a bit of Watson's testimony, since the circuit court, in reversing the commission, found that the order of the Workmen's Compensation Commission was not based upon substantial evidence. It is, of course, immaterial whether this court agrees with the findings of the doctor, but the fact remains that we certainly can not say that Watson's testimony did not constitute substantial evidence. The trial court mentioned the fact that Watson was unable to definitely define the cause of Rhodes' condition but this does not mean the doctor's testimony loses its substantiality. A similar contention was made in *U. S. Fidelity & Guaranty Co.* v. *Dorman,* 232 Ark. 749, 340 S. W. 2d 266, it being contended that the evidence was insufficient since the claimant's medical witnesses were unable to pinpoint the specific mechanism precipitating Dorman's heart attack. We held the contention to be without merit.

The circuit court stated that in reaching its conclusions, it also considered the fact that the claimant was found totally and permanently disabled by the Social Security Administration (March 31, 1967), and by the Veterans Administration (November 7, 1966). These

awards are not pertinent to the finding by the Workmen's Compensation Commission. There really is no dispute about the disability of Rhodes; the only question is "What caused the disability?" Actually, it appears from reading the opinion of the circuit court that the court was, at times, weighing the testimony rather than simply determining whether there was substantial evidence to support the findings of the commission.

The court mentioned, and appellee argues, that the referee found that the claimant suffered a compensable back injury on May 9, 1966, and it is true that this is the opening line in the referee's "findings", although the claim was denied and dismissed. This, argues appellee, is a conflict in the opinion, and though the commission did not mention this' "conflict", appellee asserts that since the commission itself made no findings, it meant to adopt those of the referee.

We find no merit in the contention. In the first place, we have several times held that no weight is to be attached to the findings of the referee. *Potlatch Forests, Inc.* v. *Smith,* 237 Ark. 468, 374 S. W. 2d 166, and cases cited therein. The commission made no such finding, but, at any rate, it will be remembered that the $40.00 bill submitted by Dr. Langford was paid by appellants. It will also be remembered that Langford's report reflected that Rhodes was able to resume work as of May 27. The referee found that the payroll records reflected that claimant was not absent a sufficient number of days to receive temporary total benefits. We have held that medical payments are a part of compensation, *Reynolds Metal Co.* v. *Brumley,* 226 Ark. 388, 290 S. W. 2d 211, and the referee likely had this in mind in making the finding heretofore mentioned.

As previously stated, we are only concerned with whether there was substantial evidence to support the commission's findings, and we are of the opinion that' Dr. Watson's testimony met that test.

It follows that the judgment of the circuit court is reversed, and the case is remanded with directions to

reinstate the order of the commission denying compensation.

It is so ordered.

JONES, J. dissents.

FOGLEMAN, J. not participating.